May it please the court, my name is Mark Thierman, I represent the plaintiffs, who are appealing from a grant of summary judgment on a record that is rife with disputed issues of fact, and unusually, I would say, the district court acknowledged the disputed issues of fact throughout her decision, and it seems to have resolved them by drawing inferences that are not the most favorable. to the plaintiffs below. Specifically, at the 390... Tell me before you start, what are the issues of fact that you see? Specifically, in this case, what fact issues do you see? What these people did in terms of... Well, I understand that, but... In terms of its significance and independent discretion to the general business operations. We have lots of testimony about discretion, but that issues of discretion, that is, they made choices, are not linked with testimony about matters of significance to the business, the general business or the business itself. And specifically, I can, well, for example, Mr. Heffelfinger testifies, in the decision, I'm quoting from the decision itself, so I'm not, you know, reaching into just the record, and I think it's 942 of the FSUP version. But you aren't saying that ultimate approval by a superior is significant, are you? That's not the case. No, what I'm saying is that the definition in Bothell of independent decision-making requires, basically, that you make decisions or, to use a labor law term, effectively recommend decisions. And what Mr. Heffelfinger says, that his decisions were 50-50 at both. What we have is a collaborative decision-making process with 400 some odd people doing this programming under the information technology banner, making decisions, most of which concern things like whether we're going to use an if statement or a then statement in a COBOL program. But that doesn't seem to be true of Mr. Heffelfinger, particularly. I mean, he seems to have had some sort of more oversight role. He was team leader, but he was also going to all the important meetings. He seems to spend most of his time going to meetings, or a lot of his time going to meetings. He seemed to be involved in the basic design questions more than simply the program-level decisions. So I guess my larger question is, is there a distinction between the three named plaintiffs in this regard? Or among them. In fact, the very next sentence, Judge Morrill says, Heffelfinger's testimony mirrors that of Dwyer, who states, any discretion or independent judgment I had on my job was minor and supervised and, too, was limited, for the most part, to technical issues. So yes, they went to meetings. And yes, he was a, quote, team leader. But he's in a group of five, maybe seven other EDS people who are talking to who knows how many government or client people. And they're sitting there and they're throwing out ideas. But he's not. And I don't know whether it's Heffelfinger or whether it's Dwyer who says, I have three levels that I have to go through before it ever gets reviewed. And there's a project manager from EDS telling people what to do. So my team consists of maybe three or four or five on an ad hoc basis, depending on the project, of similar IT people. But surely Heffelfinger was not simply a programmer. No. These people are not just programmers. But they're the complexity of what they're doing is not an issue in the exemption. It's, I mean, there's a tendency in this case and in other data professional cases. But they're, I mean, so, I mean, one of them designed a program. And that seemed to me to maybe be the least administrative thing he did, even though it's emphasized a lot. That's right. But they also seem to not, well, Heffelfinger in particular, maybe Dwyer next, and the third guy at least, Hines, seem to do some sort of system-wide. They do system-wide stuff, but they don't do policymaking for the agency that they're, who's their client. They certainly don't tell the Department of Defense how to run things. They certainly don't sit there and say, well, look, we really don't want the first four digits of the Social Security number to show up on a- Can I ask a question? Yeah. An overall view question. If you write on this, don't you go back and immediately get the class to certify? No. Why not? Because that's the dichotomy of having disputed issues of fact versus individualized inquiries. Disputed issues of fact don't mean that the class can never be certified. Disputed issues of fact, we use the Ramirez standard, reasonable expectation standard. It's right in the wage order after 2001. Ramirez was a case with inside versus outside, or outside salesmen, how much time you would spend doing sales, and they talked about, it's not, you don't use the job description, because they could be just phony job descriptions that the employer puts in there that has nothing to do with the reality. And you don't use your worst performing decision-maker employee, because he could be not living up to expectations. The test in the class cert decision, Judge Morrow even says it, the test comes from Ramirez. You have to use the reasonable expectations of what the job entails, which we take from the job description. We take from the testimony of the workers and what they do. Now here, it's interesting, because there is an agreement among the plaintiffs and the defendant that the job description roughly does correspond to what they did. Take out the fluff, and take out what sounds like highfalutin words, and what you got is a bunch of people who basically organized a database. And they used templates, and they used some programming, but it's a database. It's not a decision of policy, and it's not the general business operation of the Department of Defense, or the Department of Human Services, or whatever the client is. It's basically, it's a higher level writing of scripts. And I'm sure, you know, when I started doing this, people were looking at people who did Windows Unit, or Windows quote-unquote database administration as, you know, ooh, wow. And then all of a sudden, as we got more and more familiar with it, because it became part of our culture, and some of our children do that, you know, very easily, we realized that this is a six-week Microsoft course, and they can basically, they're just moving objects around on a program, or letting people, in the case of database administration, giving people assigned permissions so they can access certain levels of information, and writing a little bit of code that says... Because there would be somebody out working on computers as an administrator. Is that right? Well, I think the test is actually, in the old regs, in, I think it's 451-20... I want to say 204, or 205, or 207. And you talk about this in Bothell, where Bothell Court talks about it. It's the person who decides the planning, who says, okay, you're going to do this, and you're going to do that, and maybe lays out a flow sheet in order to solve the problem of how to get the product from one end, or the information from one end to the other. It's not the person who sits there and fills in the lines of code, or sits there and actually does the programming. But wasn't Heffelfinger that person, the one you're describing? No, because of the time element, because now we're in California, and the difference between California is how much time you spend on the task. All right, well, then I'm back to my first question. Okay. I mean, didn't Judge Morrow say that? Didn't Judge Morrow say that she only certified the class because she understood that there was a supervening question, which was an argument that you're no longer making, which was that these people were all per se not administrators, because they were, as I understood the issue, and it's a sensible one, except that it doesn't seem to comport with the regs, and that is what EGS's business is doing these tasks. So they're not administering EGS at all. They're just going around and giving EGS's business. That seemed to be your theory, and she rejected it. I'm not arguing that. I'm not abandoning the production dichotomy at all, because I think that, like, farmers, which, I mean, they were service people. They were, and EGS is in the business of providing information, this kind of service. This is their main business, and to the extent that these people went in staff to agencies, I still don't think that shields them, because that is the consumer of the product. There's something in the regs that says it doesn't matter whether you're being an administrator for your agency or for your client's agency, which seems odd to me, but that seems to be what it says. It does say that, but I don't think it means that. Here we have the product being the computer services that are being sold, and these people are working on the computer services. The consultants they're talking about, the Price Waterhouse or Ernst & Young or TPF&C or whatever, can come in and tell you how to run your business. They come in and make policy recommendations to the overall business. They're consultants. These people aren't consultants. These people are working on the system that the agency has in place. They're still doing the production work of making the system work. They're not coming in over at a high level and saying, you know what, you really do need a system that has six more giga brands of memory, because you can't process this without that. The best they can do is say, you know, we're running out of disk space here. You better buy some more service. Well, we're running out of disk space. Well, I don't think under Ramirez, well, if that's what she said, and maybe I don't think she said it quite that strongly, then you can never have a duties-based class under the wage orders under Ramirez, because you must figure out what percentage of time. But if we look at all the things that these people do, the percentages of, quote, unquote, planning and advising is de minimis. I mean, they don't make decisions because they don't have unfeathered discretion. They don't say to the agency, here's my recommendation. What they say is, in a group, well, I think we could do it this way, and then they kick it up the chain. It goes through three or four more layers. So it's not like they have independent, and I'll find the place you say it, or it's said in Bothell, which is, I believe, at 1129-299-F3rd, at 1129, implies the person has the authority and power to make independent choice free from immediate direction or supervision with respect to matters of significance. It's the with respect part that's missing from the equation. I don't think they made a decision. No one's testified they made a decision of significance to the operation of the client or to EDS, for that matter, independently. Well, the question is, what does the recommendation part of the regulation mean? And as you say, it does have, I think it's responsibly to direct, actually, or to recommend or something, or effectively recommend a labor law. Right. And that does have some content, but here it's not really clear what they're talking about. Well, the burden's on them. I know. Legally, what are they talking about? Okay, well, effectively recommends has got to be better than 50-50. Okay? I mean, yes, there are people who make proposals, and those proposals may or may not be accepted, but it's got to be better than 50-50, and the best they do here is, I think, it's 50-50. Dwyer says he doesn't even get to say effectively to recommend. That's the problem. Well, it doesn't say. It says recommend, right? No, it doesn't even say recommend. It says here, it says here, power to make an independent choice free from media direction. But then there's some slop on it that says something like recommend is okay. It says here, duties and responsibilities involve the performance of office and non-parole directly related to management policies of general business operations, customary exercise discretionary independent judgment, perform only general supervision work along specialized or technical lines, engage in the activities meeting the test 50%. There's no recommendation at all under the state code. No, but the federal regs. The federal regs, which, to the extent they're adopted, I don't recall them saying effectively recommend or recommend. But, you know, we all have bosses, right? I mean, sometimes the boss says no, but that doesn't mean that you're sitting around in a group and you throw out ideas, you're effectively recommending. That's, it doesn't work on the collaborative model. And the reason it doesn't work is because it's aimed at the higher level policymaker. Because it's policy and it's not, because otherwise everybody who provides any support function at all, no matter how de minimis the significance of that support function. The 2004 regs, I think it is, say, employees can exercise discretionary independent judgment even if their decisions or recommendations are reviewed at a higher level. It does not require that an employee have a finality that goes with unlimited authority and a complete absence of review. Right. The decisions made consist of recommendations for action rather than the actual shaking of action. The fact that the employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean they're not exercising discretion. But upon occasion is a lot better than 50-50. I mean, if you take it to the logical extreme the other way, any time you put a suggestion box on the factory floor, you're now letting everybody make effective, make recommendations. You haven't met that prong of the test. It's got to be more than just, well, yeah, I'll take your ideas because they're interesting or, yes, I'll take your ideas and you provide input, but I'm the one who chooses among them all the time because there are project managers above these people. There are a lot of people. In fact, I think, like I was saying before, I think it was Dwyer who complains when he did give assignments out, his immediate supervisor, who he complained had no training in COBOL, immediately micromanaged him and took him away. And that's why he was fired was that he gave people assignments and she said, no, you can't do that. That person can't work on this and this person can't work on that. So, and I don't believe Dwyer was an outlier. I believe that's the way the structure was, that these people were programmers. And, yes, they had technical information to supply, but they didn't make the policy decision and they didn't make the general business decision. Mr. Sherman, you began by saying they weren't programmers. Now you're saying they are programmers. And it's not really very useful because you did. I said these people aren't just programmers. And you said, that's right, they're not programmers. I mean, they may be slightly programmers, but at least some of them are doing, most of the time, something other than programming. Well, okay, maybe we're having a... Is that not right? What I mean by program is sitting down and writing a program. They sit down on the computer and they manipulate, they write code and they write the administrators do, actually. The other people set parameters and check off boxes and answer questions that come up on screens. And, yes, they do sit down and they say, yes, we need this and we need that. And then other people sometimes write the code for it. They're not just programmers. You also mentioned with respect to matters of significance. Yes. Is that a factual or a legal question? It's a factual question, I think. At some ends of the spectrum it becomes obvious which way it falls in undisputed, but here it's really in dispute. It's very much in dispute. And what factual allegations are there that make it disputed? Well, as the opinion says, all the declarations that they submit say they make matters of significance, but when the person most knowledgeable was deposed and asked for examples, she couldn't think of one. When Dwyer says I had discretion, was minor and supervised and limited in most part to technical issues,  I guess to combine your question with Judge Berzon's question, when you're doing the job that you're, as opposed to making policy that affects other people, when you're doing your own work, you're not exercising discretion in matters of significance because, yes, it may have collateral effects, but it's not the intent that your decisions would impact everybody else or the whole operation. It's the focus of the decision-making process on what I do and how I do it, not on what the company needs done, not on what the client needs done, or in this case, the government needs done, in many cases, because government was one of the clients. It wasn't like, oh, the government needs this, I will then do that, or my decision is the government ought to do this. The decision was, here's what the government tells me it wants, here's how I can make it happen. It's an introspective focus on, and therefore, not of significance to the overall general business of the entity. It's just my business. What would you say EDS business was with their customers? EDS supplied data processing, data solutions, network maintenance. I mean, they listed a bunch of things they do. They provide the network, and they service the network. I'm sure if I looked at PACER, there's something like an EDS running PACER or whatever this court uses for its network. They do that. They do programs to sort out your Social Security payment checks. They do a – it's like a self-spreadsheet template. They customize the template so that – And aren't these members of the class actually doing all of that for the company? Yeah, they're doing that, but they're not deciding what goes on that, and they're not deciding what is done. Is there any indication they aren't making those decisions? Well, they're deciding how to do what the company – yes, there's testimony that they go to meetings where they're told that there's a review board in Seaside, which is the Department of Defense facility, that they go to meetings that they're told what it is that they have to do. They're told what it is that has to be accomplished, when it has to be accomplished, and almost to some degree what way it has to be accomplished. They're not allowed to go outside of there and to bring in software or other things that hasn't been approved. They can't go out and buy hardware. They can't go back and reconfigure the hardware that – and the Department of Defense doesn't have extra globs of memory. They can't go out and buy the memory, or they can't go out and tell the Department of Defense we need to buy new computers. They just say, hey, we're out of memory. So it's a very limited technical role. They're very smart people, but that doesn't mean they don't get overtime. And what you've just described, isn't that the same job that all of them are doing? Pretty much, yeah, at least in this four or five subcategory, yes. The information technology subcategory, yes. They all – that's why initially EDS made a big deal about the job descriptions being overlapping and why they got combined instead of sub-subgroups. But you're right, it could be done by subgroups, but the job functions of these people are very similar. And the threshold question, the question that we don't – that there are disputed issues of fact on, and I disagree with the court's conclusion is, does what they do or how – or the decisions they make, does it rise to the level of being an administrative exempt person? Not just an administrative person, but an administrative exempt person. And the answer comes down to matters of significance to the general business, not just to their own little world or their own little implementation of somebody else's policies. And that's where I think the fundamental disconnect is. And I think that – How would you apply the 50% rule to these members of the class? Well, I would look at the which – how much time they – well, first of all, it's kind of easy. Teams consist of four or five people, so we know that 20% of the – only 20% of the time at most they're making decisions because they're only serving as a team lead 20% of the time. Of that 20%, we know that they're not making decisions all the time because they don't spend 100% of their time making decisions of significance while they're in that role. They go back into their normal working roles when they're not going to meetings. Plus, EDS keeps records of this. They have time records, like lawyers. Are you saying that each of them is a team lead at some point? No. Well, a lot of them rotate through, yeah. They change – it's a fluid – But Heffelfinger, for sure, has been one for the entire time that they serve. He has been, yeah, most of the time, actually. All right. Thank you. Thank you. I hope I reserved some time. I'm going to give him the microphone. May it please the Court. My name is Martin Weimer. I represent Defendant Appelli, Electronic Data Systems Corporation, or EDS. I'd like to start out by responding to Judge Pander's question. What EDS does, and I've represented them for 20 years, is they are hired by big companies, medium-sized companies, and governments to solve complex information technology problems. And that's what the three class representatives and the members of the class did. As to Judge Reinhardt's question – They don't run the systems? I mean, you can phrase things how you want, but isn't what they do go in there and use – I mean, they do a variety of things. They might – I gather on some occasions they might design a new program or system, but a lot of the time they're just taking existing software and putting it on the system and making it work. Isn't that right? That's not what the class representatives testified that they did. Mr. Thierman talked a lot about the disputed issues of fact. Let's just look at the class representative's declarations. Executed the – Heffelfinger said he used existing Oracle software. He didn't make any software of his own, and he made it work, essentially. That's what I understood him to say. Who's that judge? Heffelfinger. Heffelfinger. Heffelfinger said in his declaration, I was responsible for the design and integrity of database structures in a multi-user environment. Again, this isn't him answering yes to a question during the crucible of cross-examination. This is Mr. Heffelfinger in the comfort of his lawyer's office describing what he did in signing a declaration. He said he developed database standards. He analyzed data and process requirements. This is all in paragraph 6 of his declaration. He led database design efforts. He was involved in designing the architecture of the database. He suggested architecture to clients. Mr. Heffelfinger was a team lead responsible for the management of the database of the personnel arm of the Department of Defense. A database – talk about matters of significance. This database contained detailed information on 28 million people, all members of the armed services, veterans, all their dependents. It was the database used to pay all sorts of insurance and other veterans benefits related claims to up to 28 million people. And a database, despite opposing counsel's minimization of that, a database for an entire organization as vast as the Department of Defense, that is a matter of significance to move table space or to recommend new servers. There's thousands of servers. Go ahead. He said he couldn't move table space without getting approval, without – he could recommend it, but he couldn't do it. Well, as the Court noted, the administrative regulations, which were incorporated into California law in the wage order in 2000, even the old regulations say that final approval is not necessary. You just need to recommend actions. I mean, it seems a little – when you're dealing with technical – I mean, I was thinking about this. When you're dealing with technical people in particular, non-technical people are going to ask them for recommendations. I mean, I go to the Apple store and I say, what should I buy? And somebody gives me a technical explanation, and then I either do it or I don't do it. They're making me a recommendation, but I don't think that's the kind of recommendation we're talking about. Well, Mr. Heffelfinger, for instance, testified again in his declaration in paragraph 15. He suggested best practices concerning database management to the customers. And they also took our suggestions or did not. Sometimes they're – sometimes they're denied, sometimes they're not. That's a heck of a lot of a different animal than suggesting whether to get an iPad or an iPod, Your Honor. We thought about it. Mr. Heffelfinger also testified in his declaration that he would recommend solutions to technical specifications of the database, that he recommended various database architectures. That's how this massive database would be constructed. And let's remember what a database is. As Mr. Tuft Heffelfinger said, it's a multiple-user environment. There's thousands of people at the Department of Defense that can access the database. And they, in turn, go on a sophisticated computer network, which is linked by servers. And what Mr. Heffelfinger and Mr. Hines' job was to maintain this database so that these thousands of users could go in and get data, get it out, use it, put it back in, without corrupting the database. This involved independent judgment in that they made recommendations. Mr. Heffelfinger also testified he was a technical team lead and that he directed the work and scheduled the work of his subordinates. But in the data processing field, when you recommend more table space or you recommend the purchase of additional servers, you are, as the, excuse me, you are, as the regulation contemplates, and I think Your Honor read an excerpt from it, or Mr. Thierman did, you're considering various alternatives, you're considering various possible courses of action, and using independent judgment and discretion, making a recommendation based on that. So we have, for example, at the court, somebody, we have the electronic case filing system, and somebody designed it, or a group of people put it together, and presumably we have a court committee, and staff has supervised them, and we asked them, I'm just hypothesizing now, you know, should we do it this way or that way, and they gave us technical reasons why we should do it this way rather than that way, and presumably the administrative people made a decision. Those are the people we're talking about essentially, people like that, people who are putting together a database, which is what that is, you know, mostly by physically doing it, but they have to ask, they have to make decisions along the way, and they might consult, you know, give the options on the important decisions, do you want it this way or that way, to the people who run the court, and we don't think of them as the people who run the court, and that's the question. Is that what we're trying to find out? Breyer. Judge, they don't need to run the court. Well, I don't mean judges. I mean, but they're not administrative. I would not think of them as administrative people in an ordinary sense of the word. Your Honor, the regulations make clear. 541.205c, those are the regulations that were incorporated into the wage order in 2000. We don't have to quibble today about old regs or new regs. Let's look at the old regs. 541.205c defines substantial importance, which is necessary component of the directly related to business operations problem. It's not limited to persons who participate in the formulation of management policies or operations of the business as a whole. Direct quote. It applies to a wide variety of persons who either carry out major assignments or whose work affects business operations to a substantial degree. I would submit, Your Honor, that Heffelfinger and Hines, in maintaining the integrity in designing enhancements to a database with this big an impact on the Department of Defense's operations, carry out major assignments related to the business operations of the Department of Defense. Mr. Dwyer, his own words in his declaration, said that the computer program he conceptualized and designed was integral to the correct processing of Medicaid claims for all Medicaid recipients in California. That's exactly what MediCal does. So every one of the people who are working on this, I mean, every one of them can make a mistake and screw everything up. That's not what I'm saying, Your Honor. And the regulations do point, you know, point that out. But it's not a matter of making a mistake. Mr. Dwyer, who engaged in high-level computer programming, wrote a program that he himself testified was the heart of the outbound claims process for paying Medicaid claims. So it's not whether or not he made a mistake. He, the customer, said, we'd like to be able to do X, Y, and Z in paying claims. Dwyer's job is to go figure out how to get to X, Y, and Z through a sophisticated computer program. He used the words, I conceptualized, designed, constructed, and tested the program. And it was then integral to the correct processing of claims. So I'm not focusing on whether somebody made a mistake that would have a big impact on the customer. Anybody, I think the regulations speak to the issue. Any workman that uses very expensive machinery  but the person that answered, that solved Medicaid's IT problem, we would like in processing a claim, we'd like it to do X, Y, and Z. Can y'all do it? Then writes a program that he conceptualized, that he thought up, that he designed, and that he constructed. And then using the exact terminology almost verbatim from the regulations, 205C7, which uses a programmer as an example of someone that is involved in independent judgment discretion. There was an exchange earlier about do they do mere programming. Well, the regulations make it clear if a programmer in designing a program is engaged in planning, scheduling, and coordination to develop the program to meet the business requirements of a customer, he's exercising independent judgment on matters of significance. It's 205C7. How could they have employed an architect? I mean, a literal architect, because we keep using the word architecture in here. Yes. You know, who was going to design buildings for them. Mm-hmm. Is that person an administrator? An administrative employee? I would say the architect that designs the building would be engaged in work directly related to the business operations of the customer, in this case an individual. I would say that his work is of substantial importance. It seems to me that those sorts of people are important people, but they're technical people who you're employing for your purposes, and they're not giving you the purposes or having anything. I mean, the chief architect or the administrator, the guy who runs the data system is a different thing. Well, an architect judge might be covered by the professional exemption. No, I understand that. These people might be covered by the computer exemption, but they're not, or at least only some of them are because they don't make enough money. Some of them do and some of them don't. This also brings up another point. Judge Morrow, and again, I know the court and the staff and the clerks will look carefully at the record. Judge Morrow went through a 15-page analysis and made it very clear she was only looking at undisputed facts, not characterizations, not EDS saying, oh, they have a lot of independent judgment, and not the plaintiffs saying they didn't. But she concluded that 100% of what they did was exempt, and that can't be right, can it? Well, Judge, for one thing, plaintiffs never raise the issue of the time allocation below. Never raised it. I direct the court to their brief opposing summary judgment. Not once do they say time allocation is necessary. They recited the elements of the exemption, said EDS had to prove them, but there's not one sentence saying time allocation is necessary. The court wasn't required to, isn't required to search the record for possible issues that the plaintiffs didn't raise. But she did. She decided it. She said it was 100%. She could have, I mean, that actually surprised me because I would have thought once she rejected their basic legal theory, which is the one in which she had granted the class cert, I would have thought she would have stopped there just to certify the class. But she didn't. She instead went on and decided a different question, and I think a different question than you had raised, too, which is whether even rejecting their basic production administrative theory, which I want to ask you about in a minute, it was still, they still lose. Well, Your Honor, she only reached that issue as sort of a moreover point. She pointed out in footnotes 116. Just tell me she spent 15 pages doing it, which I think she did. Oh, she spent 15 pages. I'm sorry, Judge, if I was unclear. She spent 15 pages weighing the evidence and pointing out what was disputed and what was not disputed and came to the conclusion the only disputed issue is the party's characterization of whether the work met the exemption, not the actual facts, not actually what they did. It's like pages 4 through 19 of her opinion, and she made it very clear that she was only relying on undisputed facts. As to the time allocation argument, Your Honor, she pointed out in footnote 116 of her decision that plaintiffs never raised it. The kind of evidence that they never raised it is two days after the summary judgment hearing, they tried to file a surreply and raise that issue for the first time. Can I ask a slightly different question now? Yes. Bothell is a case of this Court, and it does seem to apply the administrative production economy. So how can we just say we're not going to do it? Your Honor, the Court did not apply this administrative production economy. They discussed it. They noted that the Court, the State court in Bell, had said that administrative production dichotomy should be exercised with great caution, but they did not apply the administrative production dichotomy in that case. Instead what they did was that was a case where there was a judgment for the employer below. They found a genuine issue as to Mr. Bothell's duties. They found that if you believed Mr. Bothell's evidence, he was just, quote, a highly skilled repairman. So though they discussed the administrative production dichotomy, they did not apply it in that case, Your Honor. They looked at his actual duties and the evidence of his duties. An interesting thing, an interesting thing about Bothell, it was cited repeatedly by plaintiffs in their brief for the notion that one must run the business or determine overall policies to be covered by the administrative exemption. Number one, the court in Farmers rejected that argument. Number two, it's inconsistent with the regulations that were expressly incorporated into the wage order. And number three, it's well settled. The regulations themselves, 541.205, clearly state that the administrative exemption can apply to work performed by an employer's customers. And if you accept that and the regulations state it clearly, then the broad statement from Bothell couldn't apply to work that is performed for customers, because if you're doing work for a customer, you'll never be charged with running the customer's business. At least in my experience, businesses don't hire consultants to run the business or to make policy decisions for the business. They hire consultants and tax advisors and IT professionals to bring their expertise to bear and make suggestions or recommendations or, in the course of Dwyer, figure out complicated IT solutions to their problems, conceptualize it, design it, construct it, test it, make sure it does what the customer wants, to create or modify a program to meet the end business requirement of the customer. If what? If there were some dispute about this in the brief, so if we were to reverse the summary judgment on any one of these people, what would happen next? Well, I believe we would renew our motion to decertify the case. Unless I'm not here, you wouldn't think we should be doing it. We filed a cross appeal. I think that the plaintiffs have taken positions here, and in light of Vanol, Wells Fargo, Marlowe II, you can't come in and just rely on a blanket exemption policy or rely just on job descriptions, and that's what they did in their brief. They said, just look at the job descriptions. That's all you need to look at here. But they had a legal theory that that went to, and the legal theory was right or wrong. She decided it was wrong. So, I mean, in other words, if we weren't prepared to say that she was wrong when she certified it to begin with, then we would just leave it to what happens afterwards. I'm sorry, Judge? Then we would just let the case go back and have you,  And that should be the district court, no? That's one way it could go, Judge, or the interest of judicial efficiency. If this Court sees that based on developments in the law and the fact that the legal theory was resolved in favor of EDS, that the class can no longer be maintained, this Court, if it were inclined to reverse on one or more of the job codes, this should not stand, that from the benefit of today's hindsight, that the class should no longer be maintained and remand for any individuals they believe presented a genuine issue of material fact precluding summary judgment. It's at the Court's discretion which way they want to go. If the Court elected to address the issue, I would submit that, I mean, this case is indistinguishable from Marlowe too. And in that case, the Court found that even if the company had job descriptions and presumably expected class members to do what was in the job descriptions, it doesn't show that they were actually engaged in day-to-day duties consistent with the job descriptions and that an individualized determination as to what they actually do would be required. And at the end of the day, plaintiff appellants can't have it both ways. They can't come here and say the district court erred by not doing what we never asked her to do, by not making a time allocation, weighing the different tasks in the job descriptions, and then determining which duties were exempt and which duties were not exempt, and then seeing if she came up with more than 50%. They can't say that and then deny that an individualized determination would be required and that the case, the class, isn't subject to representative proof. And getting back to a point you raised earlier, Judge Prezone, I think the Court concluded I'll get back to it fairly quickly. Your time is up. I think the Court concluded, thank you, Judge. I think the Court concluded that 100 percent of these fellows' time was spent on exempt tasks because of the way they phrased their declarations. They said our primary duties were this, and they consisted of that. And by phrasing it like that, they described duties that in total were administratively exempt. So at the very least, though it might not have been 100 percent, when you say my duties primarily consisted of the following functions, you're saying that more than half your time was spent on this function. Thank you, Judge. Thank you. Thank you. Just a quick note or two. In, I think it's 492 of the last sentence starts and continues on to the next page, it is undisputed that EDS database administrators and system administrators seniors are involved in designing system architect. It is also undisputed that the employees in these job categories write computer code. So they were programmers, writing computer code means programming. And that's how you get all this stuff to be done. It's not that they just went to meetings and gave talks about it. They went to meetings and then they went back and they did it. And there was, and then the next sentence is there's a dispute. The principle dispute concerns the extent to which the administrative exercise, the independent judgment and perform high-level work. But again, it's not the high-level work and it's not the exercise of discretion in the vacuum or doing your own job. It's the exercise of discretion on policies and or matters of significance to the overall business. Likewise, the first sentence of section 116, footnote 116 was, you know, we were always talking about the 50% rule and we were always talking about time allocation. What we said was none of it was. And because these people are not, as Your Honor pointed out, they weren't even going to the meetings that the ECF committee may have gone to. They were two, three levels down. Their recommendations were filtered through other people. And finally, there are 400 of them. I mean, one doesn't take 400 or 500 people all doing matters of significance and making policy decisions because then you would have them interacting and contradicting. The high-level. It's an unusual situation in which they're working off-site essentially. They're not, I mean, it would be hard to have 400 people in one company, but there weren't 400 people in one company. There were a bunch of different companies. No, but there were 60 at Seaside and there were 30 here and 12 there. You don't, see, in my opinion, and when I read the administrative exemption, I think of business consultant, unlike counsel, I think there are business consultants who come in and tell you how to run your business. You hire them, and if you ran a law firm, it would be Altman and Wild or one of those, Hildebrandt, and they would tell you, yes, you should build more here and you should do this there and put the desks up. And you either do it or you don't do it. Well, that's true, but you pay for the advice. But the recommendation itself is what you're buying. In this case, these people were not at that level. They weren't telling the Department of Defense how to even organize the information they got. They were trying to figure out how many digits to put in a field. It's not the same thing. It's not really, yes, the database may be huge and it may have tremendous significance, and we all use the analogy of a person who doesn't deliver the mail and the business goes out of business or they didn't get the check or they didn't do whatever, but they're still the mailman. The database may be huge and significant, but what these people were doing was saying, well, we need an extra couple of digits. And, yeah, I know, the person who's in the 1950s who decided not to put the first two digits of the year in caused the, remember the 2000 millennium bug? And it caused all those computer programs because they didn't have enough space in the memory. Well, somebody made that decision, but it was not a high-level significant decision, even though it had high-level significance. And that's the difference. These people were not at that level. Thank you. Thank you, counsel. The case just argued will be submitted. The court will stand and recess for the day.
judges: Panner, Reinhardt, Berzon